UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT C. ELLIOTT,

                     Petitioner,                          **DECISION AND ORDER**
                                                       No. 03-CV-6266

     -vs-

JAMES T. CONWAY, Superintendent,
Attica Correctional Facility,

                     Respondent.
_____

## INTRODUCTION

Petitioner, Robert C. Elliott ("Elliott"), filed this *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in New York State Supreme

Court (Erie County) on one count of depraved indifference murder. The parties have consented to

disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from Elliott's alleged involvement in the death of his

forty-two-year-old girlfriend, Carol Dunnigan ("Dunnigan"). Dunnigan, who was last seen alive

at 7:00 a.m. on May 11, 1997, was discovered lifeless in her bed by neighbor Michael Mueller

("Mueller") at 9:30 p.m. that night. Mueller had gone to Dunnigan's apartment after receiving a

phone call from Elliott in which Elliott claimed to have strangled Dunnigan. The grand jury

returned an indictment charging Elliott with two counts of murder in the second degree (N.Y.

Penal Law §§ 125.25(1) (intentional murder), 125.25(2) (depraved indifference murder). He was

tried before a jury in Erie County Supreme Court (Burns, J.).

At trial, the prosecution produced evidence that Mueller and his wife Karen were neighbors and friends of Elliott and Dunnigan. T.47-48.[1] Between 11:30 p.m. and midnight on May 10, 1997, Mueller returned home from work. As he pulled into his driveway, he noticed that the light was on at Dunnigan's apartment, and he decided to visit. T.50. Dunnigan invited Mueller in for a beer; she and Elliott drank coffee. Mueller observed that the "house was a mess, papers all over and broken glass." T.51-52. Dunnigan, whom Mueller saw was drunk, began arguing with Elliott and calling him names. According to Mueller, Elliott just laughed it off. T.53. When Mueller told Dunnigan to "cut it out" and go to bed, she threw her cup of hot coffee at Elliott, spilling it on his pants. *Id.*

Sometime after 1:00 a.m., Dunnigan retired to bed, and Mueller and Elliott visited the neighborhood bar where they remained until closing time at 4:30 a.m. T.54. When they returned to Dunnigan's apartment, they continued drinking. Dunnigan awoke, became angry at Elliott, and another argument erupted between the two of them. Mueller recalled that Dunnigan was screaming at Elliott that she wanted him out of her house and kept hitting him in the head and shoulders with her closed fists. T.57-58. Elliott responded by walking over to a hutch filled with knickknacks and hurling it onto the floor. T.59.

Dunnigan then ran next door, pounding on Karen Mueller's bedroom window until Karen woke up. T.60. Karen recalled that Dunnigan was angry and upset; she told Karen that she wanted Elliott out of her house. T.122. Karen got up and went over to Dunnigan's apartment with her, where she observed "beer cans everywhere and broken glass." T.123. Karen returned to Dunnigan's apartment and cleaned up the broken glass, after which Karen went into Dunnigan's

---

[1]  Citations to "T.___" are to the trial transcript.

bedroom and remained with her for a while, attempting to comfort her. T.61, 127. Mueller and his wife left Dunnigan's apartment about 7:00 a.m., and went to bed. T.62. Before leaving, Karen asked Elliott if he wanted to sleep on their couch, but Elliott declined, stating that "everything would be fine." T.127.

At about 8:00 a.m., Karen called Elliott and Dunnigan to check on them. Elliott answered the phone and assured Karen that Dunnigan was sleeping and everything was alright. T.129. Karen spoke to Elliott again on the phone at 11:30 a.m. and was told that Dunnigan was still sleeping. T.133.

Sometime after 2:30 p.m. on May 11, Mueller received a phone call from Elliott in which Elliott asked to borrow some money. Mueller gave him $80. On the way back to his apartment, Mueller knocked on Dunnigan's bedroom window but received no response. T.64-65. Mueller recalled that he and his family went to go visit his mother-in-law at about 4:00 p.m. that afternoon and returned home at 6:00 p.m. T.134.

As Mueller was watching television that night, his niece called him to the telephone sometime after 8:00 p.m., stating that it was Elliott and that it was an emergency. T.67. When Mueller answered the phone, Elliott told him, "Mike, I killed Carol." *Id.* Karen heard her husband say to Elliott, "Ducky, that is not funny, don't talk like that, cut it out." T.135. Mueller recalled that he said to Elliott, "cut that shit out." According to Mueller, Elliott twice repeated that he had killed Dunnigan by strangling her. T.69. Mueller hung up the phone and informed his wife Karen of what Elliott had said. He began to go next door, but Karen stopped him and called the police. T.69. Mueller yelled outside Dunnigan's bedroom window and banged on the door in an attempt to attract Dunnigan's attention, but it was to no avail. T.137.

-3-

Julie McGhee ("McGhee"), Karen's niece, testified that she was visiting the Muellers on the night of May 11 when the phone rang at about 8:30 p.m. T.160. Elliott was on the line; he told her that it was an emergency and that he "needed to speak to Mike." T.160-61. McGhee overheard Mueller talking to Elliott on the phone, saying, "Don't say that, it's not funny." T.161. When Mueller hung up, McGhee heard him tell her aunt that Elliott just said that he had killed Dunnigan, that he was at the Isle View bar, and that he was going to kill himself. T.162.

The prosecution called Rachel Sparrow ("Sparrow"), a bartender at the Isle View Riverwalk Cafe. Sparrow saw Elliott in the bar on May 11; he consumed between six and eight drinks and ordered a cheeseburger. T.204-07.  She observed Elliott talking with other customers and playing QuickDraw. T.207. As Sparrow recalled, Elliott left the Isle View at 8:00 p.m. with his brother. T.208-09.

Paul Elliott ("Paul"), petitioner's brother, returned home from work on May 11 at about 3:30 p.m. to find several messages from Elliott on his answering machine. T.344. Although Elliott "sounded serious," Paul did not return the calls because he did not have a number to contact his brother. *Id.* A few hours later, Elliott called him and said that he was at Isle View Bar and needed money because he (Elliott) was thinking about leaving town. T.345. When Paul met Elliott at the bar, he found that Elliott had been drinking and that his speech was slurred. T.348. Elliott explained that he had had an argument with Dunnigan and may have hurt her. T.347. Paul recalled that Elliott said that Dunnigan had been lying in bed and "had started to turn colors." *Id.* Elliott told Paul that he thought she was dead. *Id.*

Officer Wayne Hopfer ("Officer Hopfer") responded to the 911 call placed by the Muellers. T.215-16. Upon entering the apartment, he found Dunnigan's naked body lying face

down in her bed. T.218, 232. He noticed that Dunnigan's body was cold to the touch and that

there was redness on her upper body, although he did not see any signs of a struggle. T.228-29.

Detective Thomas Badgley ("Detective Badgley") also responded to the 911 call and

photographed the premises and Dunnigan's body. T.285. When he rolled the body over in the

bed, he observed a "dark mark" on Dunnigan's neck and lividity on the front portion of her body.

T.317, 330.  Three days later, on May 14, 1997, Detective Badgley went to the funeral home to

photograph Dunnigan's body again. T.291, 298. At that time, the body had been embalmed, but

no make-up had been applied to the neck area or face. T.292, 301. Detective Badgley recalled

that the lividity had disappeared from the neck area and that the coloration of the body varied

from area to area. T.293, 304. He also observed bruises on Dunnigan's body. T.310.

Dr. Sung-ook Baik ("Dr. Baik"), the associate medical examiner for Erie County,

performed an autopsy on Dunnigan's body on May 12, 1997. T.349, 352. His examination of the

exterior of the body revealed developmental lividity and Tardieu's spots on the neck and chest.

T.354. Dr. Baik explained that the Tardieu's spots occur when the blood fails to circulate and

then accumulates and descends into parts of the body. T.355. He also found bruises on the lateral

part of the right forearm, the right wrist, the left forearm, the back of the left hand, both elbows,

the left hip, and the left thigh and flank, as well as an abrasion the right side of the neck. *Id.* In

his opinion, the abrasion on Dunnigan's neck could have been caused by someone applying

pressure with one's hands. T.356.

Dr. Baik also testified that all of the bruises on Dunnigan's body were made before she

died; a bruise cannot form on a dead body because once the heart stops pumping, blood ceases to

circulate in the body. T.358-60. His opinion that the bruises were fresh was reinforced by his

discovery of hemorrahaging beneath the skin, which was revealed when he made incisions into the bruised areas. T.359-62.

Dr. Baik's "Y" incision to open the body revealed pulmonary edema in the lungs due to a lack of oxygen. T.363. Examination of the cranial cavity indicated cerebral edema as a result of asphyxia. T.365.  An incision into the neck area revealed hemorrhaging in the neck muscle. *Id.* In the larynx, Dr. Baik found a fracture of the left thyroid cartilage and muscle. The hyoid bone (a U-shaped bone at the base of the tongue that supports the muscles of the tongue) showed partial separation at the left joint and hemorrhaging in the muscle. T.366. Dr. Baik testified that the hemorrhaging found in the front left and right sides of the neck muscle was a result of pressure to the neck which occurred before death. T.367-68. In his opinion, the damage to the hyoid bone (breakage on the left side) was caused by severe pressure to the neck organs and neck muscle. T.370.

Toxicological testing of Dunnigan's blood showed the presence of three drugs in low levels: diphenhydramine (Benadryl), venlafaxine (Effexor), and Trazodone. Dr. Baik testified that Effexor and Trazodone were both anti-depressants. Blood testing also indicated that Dunnigan had a high level of alcohol in her system. T.375. According to Dr. Baik, the drugs and alcohol did not cause Dunnigan's death. Rather, she died as a result of manual strangulation. T.376-77. Dr. Baik arrived at this conclusion based on his autopsy findings of an abrasion on the right side of the neck indicating the application of pressure; areas of hemorrhage in the neck muscle indicating the application of pressure; breakage in the great cornu area of the thyroid cartilage, indicating the application of pressure; and partial separation of the hyoid bone, indicating pressure around the neck. T.377.

Dr. Baik related that there are times when bruises are hidden or unseen at the time of an autopsy but show up more clearly after all of the blood is removed from the body for embalming. T.378-79. Dr. Baik noted that if bruises are hidden by livor mortis (the maroon color that develops after the heart stops), when the blood is removed from the body, the bruises show up more clearly. T.379. According to Dr. Baik, the bruises found on Dunnigan's body were not made after her death and embalming would not have caused them.

On cross-examination, Dr. Baik admitted that his autopsy did not reveal any sign of petechial hemorrhage (a rupture of the capillaries in the eyes and facial skin). However, he testified that petechial hemorrhage is not necessarily a hallmark of strangulation, but its presence helps to support such a finding. T.427-28, 431. He explained that if pressure is applied to the carotid sinus (a localized dilation of the internal carotid artery at its origin), it can cause fatal cardiac arrhythmia; no petechial hemorrhage will occur because the heart is already dead. T.480. Dr. Baik conceded that another indication of strangulation is bruising to the neck and that he did not find a bruise on Dunnigan's neck, only an abrasion. T.432-33. Dr. Baik also agreed that pulmonary edema, while consistent with asphyxia, is also consistent with cardiac failure. T.471.

The prosecution next called Dr. Robert Osiewicz ("Dr. Osiewicz"), a forensic toxicologist who performed tests on Dunnigan's blood, bile, liver, and gastric contents. T.494, 497. His results indicated the presence of less than 0.05 micrograms per millimeter of Benadryl; 0.38 micrograms per millimeter of Effexor in her blood. Her gastric contents contained 10 milligrams of Trazodone--less than one full pill. Dunnigan's blood-alcohol content was 0.19 %, which was relatively high. T.504. In his opinion, the combination of drugs and alcohol found in Dunnigan's body would not have been toxic or lethal because they were not life-threatening or found in high

concentrations. *Id.* His testing of Dunnigan's gastric contents ruled out the possibility of an

overdose. T.507-08.

Dr. Osiewicz testified that he researched the drugs found in Dunnigan's body and the

levels in which they had to be present in order to be toxic. With regard to Effexor, a relatively

new drug, there was not much literature, but it did not appear that it was a toxic drug. His

research revealed that for Trazodone to be toxic, it would have to have been found in levels 100

times higher than those detected in Dunnigan. T.512. Dr. Osiewic noted that both Effexor and

Trazodone redistribute after death, which means that the concentration levels of the drugs rise in

relation to what they were before death. In other words, the levels of those two drugs would have

been lower prior to death. T.513. In Dr. Osiewicz's opinion, Dunnigan probably had one or two

tablets each of Effexor and Trazodone in her body at the time of death. T.555.

The defense called Dr. Cedric Smith ("Dr. Smith"), a physician and professor of

pharmacology at the University of Buffalo. T.634. After reviewing the autopsy and toxicology

reports, it was Dr. Smith's opinion that Dunnigan's heavy alcohol use and history of alcoholism

put her at risk for suffering cardiac arrhythmia. T.660. Dr. Smith testified that the level of

Effexor in Dunnigan's body (0.38 micrograms) was higher than the normal therapeutic dose of

0.07 micrograms. T.678-79. He also opined that Dunnigan had ingested Trazodone within one

hour of her death. T.690. Dr. Smith stated that the combination of drugs and alcohol in

Dunnigan's body could have caused an adverse reaction, namely, fatal cardiac arrhythmia. T.692.

On cross-examination, Dr. Smith conceded that Trazodone and alcohol might not have

any effect whatsoever on the possibility of cardiac arrhythmia and that he had no way of stating,

to any degree of medical certainty, that the cause of Dunnigan's death was due to the

combination of drugs and alcohol in her body. T.712-13.

The defense next called Dr. Louis Roh ("Dr. Roh"), the deputy chief medical examiner in Westchester County, New York. Dr. Roh reviewed the autopsy and toxicology reports and viewed photographs of the scene and the body. T.726, 733. Dr. Roh testified that he had performed several autopsies involving manual strangulation as the cause of death, and he outlined the signs commonly found: nail marks of the strangler compressing the victim's neck, scratch marks by the victim on the attacker's hands, broken nails on the victim's hands, petechial hemorrhage on the victim, and facial cyanosis (a reddish-purple discoloration of the skin due to poor circulation). T.735-38.

Dr. Roh disagreed wtih Dr. Baik's conclusion that Dunnigan had sustained an abrasian to her neck, characterizing the mark instead as a post-mortem artifact. T.740-41. Dr. Roh based his conclusion on the fact that Dunnigan's body showed no discoloration in the photographs taken at the scene or in the autopsy photographs. T.741, 748.  Dr. Roh further noted that the area shown in the photograph of Dunnigan taken at the funeral parlor after embalming was not a bruise, but a discoloration after the autopsy, since it is impossible to form bruises days after death. T.752.

In cases of suspected manual strangulation, Dr. Roh stated, it is necessary to autopsy the neck area last, in order to differentiate between actual bruising and post-mortem leakage of blood into the tissue in the neck area. T.752. This method allows the blood in the body cavity and brain to drain out, so that when examination of the neck occurs, there will not be any post-mortem artifact, *e.g.*, no slippage of the skin or leakage of blood into the tissue, which can mimic bruising. T.753. Dr. Roh further testified that in cases of suspected manual strangulation, his procedure for removal of the neck organs is to gently dissect the organs, pulling downward with

minimal manipulation so to remove them in one piece and prevent artifactual fractures. T.754. Dr. Roh noted that he had never heard of Dr. Baik's manner of removal which involved an incision along the mandible and the removal of the larynx, hyoid bone and tongue. *Id.*

In Dr. Roh's opinion, the absence of any petechial hemorrhage was an indication that Dunnigan had not been strangled. T.778. He attributed the fracture or separation of the left superior cornu of the thyroid to a post-mortem artifact, possibly occurring during the autopsy. Dr. Roh noted that he himself had accidentally fractured this bone while performing other autopsies, and that was no hemorrhaging around the fractures. T.777. Dr. Roh stated that his review of the autopsy failed to suggest a carotid sinus reflex. T.780.

In conclusion, Dr. Roh noted that both Trazodone and Effexor in conjuction with alcohol could cause sudden cardiac arrest. T.785. Dr. Roh opined that Dunnigan had not been manually strangled, but instead had died of a mixed-drug overdose.

On cross-examination, Dr. Roh admitted that he was receiving a fee of $3,000 per day and was billing at a rate of $250 per hour. T.788-89. Dr. Roh conceded that in evaluating a case such as this, any statements attributed to a defendant are important. Dr. Roh admitted that he had been informed that Elliott had told Mueller that he had killed Dunnigan, but he insisted that he found no such evidence in his review of the case. T.792. Dr. Roh testified that he was unaware that Elliott had told someone that he had choked Dunnigan. He stated that such a statement was an important factor, and that he would have looked at the evidence in a different light with this knowledge. T.793. Dr. Roh further testified that if pressure to Dunnigan's neck had been applied, and then released and reapplied, there would not have been any petechial hemorrhage. T.804.

-10-

Dr. Nicholas Forbes ("Dr. Forbes"), the chief medical examiner for Monroe County, testified in rebuttal for the prosecution. Dr. Forbes examined the photographs and report of the autopsy, which he noted showed recent bruises and definite areas of hemorrhage on the forearms, flank and right hip. T.856-57. Dr. Forbes testified that the bruising and hemorrhage on the anterior portion of Dunnigan's neck resulted from the application of force and were pre-death injuries. T.857-58.

Dr. Forbes explained that while there was no visible area of bruising on Dunnigan's neck at the time her body was observed at the scene or at the autopsy, it would have appeared later due to further drainage of the blood in the body which allows bruises to become more evident. T.864. Dr. Forbes also noted that while petechial hemorrhage is often found in cases of manual strangulation, it is not always present. T.867. Dr. Forbes opined that Dunnigan's death was caused the application of force to her neck with resultant asphyxia. T.868. Dr. Forbes further stated that although Dunnigan had a significant amount of alcohol in her system, the drugs present were in insignificant amounts and were not the cause of death. T.869, 910.

The jury returned a verdict acquitting Elliott of intentional murder and convicting him of depraved indifference murder. He was sentenced to fifteen years to life.

The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed his conviction. The New York Court of Appeals denied leave to appeal.

This habeas petition followed. Elliott raises only one ground for habeas relief: insufficiency of the evidence. The claim is fully exhausted and properly before this Court. For the reasons set forth below, the petition is denied.

## DISCUSSION

**Insufficiency of the evidence**

Elliott contends that the evidence was legally insufficient to support his conviction on the count of depraved indifference murder.  Defendants challenging the sufficiency of the evidence to support their convictions bear a "very heavy burden." *Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir. 1995). When reviewing a claim of insufficient evidence, courts must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The reviewing court must defer to the jury's "assessments of the weight of the evidence and the credibility of witnesses," *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996), and may only grant habeas relief if the petitioner has shown that, "upon the record evidence adduced at the trial *no* rational trier of fact could have found proof of guilt beyond a reasonable doubt," *Jackson*, 443 U.S. at 324 (emphasis added); *accord Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002); *see also Herrara v. Collins*, 506 U.S. 390, 401 (1993). The jury is exclusively responsible for determining the credibility of a witness, and a habeas court may not revisit the fact-finder's credibility determinations. *Marshall v. Lonberger*, 459 U.S. 422, 432-35 (1983); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993).  As the Second Circuit has instructed, "'[t]he task is to ascertain whether the record evidence on which the trier of fact relied was of sufficient quality to support the verdict. . . . Since it is the trier of fact that weighs the evidence, determines credibility and draws inferences from historic to ultimate facts, a federal court, in analyzing sufficiency, should not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.". . .

Instead, it stands in the shoes of the state trial court, and must consider whether a rational trier of fact could properly find or infer that the accused is guilty beyond a reasonable doubt.'" *Rapetti v. James*, 784 F.2d 85, 91 (2d Cir. 1986) (quoting *Mallette v. Scully*, 752 F.2d 26, 31 (2d Cir. 1984) (quotations and citations omitted)).

The relevant state law determines in this case whether a  rational juror could have found that petitioner acted with "depraved indifference" on the night that the victim died. *Mallette*, 752 F.2d at 31; *accord Rapetti*, 784 F.2d at 91. Depraved indifference murder, like reckless manslaughter, is a non-intentional homicide. People v. Roe, 74 N.Y.2d 20, 24, 544 N.Y.S.2d 297 (N.Y. 1989). The New York Court of Appeals has explained that it "differs from manslaughter . . . in that it must be shown that the actor's reckless conduct is imminently dangerous and presents a grave risk of death; in manslaughter, the conduct need only present the lesser 'substantial risk' of death[.]" *Id.* (citing *People v. Register*, 60 N.Y.2d 270, 276, 469 N.Y.S.2d 599 (N.Y. 1983); *People v. Gomez*, 65 N.Y.2d 9, 11, 489 N.Y.S.2d 156 (N.Y. 1985)). The question of whether the lesser risk sufficient for manslaughter is elevated into the "very substantial risk present in murder depends upon the wantonness of defendant's acts–*i.e.*, whether they were committed '[u]nder circumstances evincing a depraved indifference to human life[.]'" *Id.* (quoting N.Y. (Penal Law § 125.25(2)). However, the element of "depraved indifference" is *not a mens rea* element focusing on subjective intent of the defendant, as it is with intentional murder. *Id.* (citing N.Y. Penal Law § 125.25 (1)). Rather, the determination of whether the circumstances of the death at issue evince a depraved indifference to human life "involves 'an objective assessment of the degree of risk presented by defendant's reckless conduct'" *Id.* (quoting *People v. Register*, 60 N.Y.2d at 277, 469 and citing *People v. Gomez*, 65 N.Y.2d at 11).

-13-

Thus, the only mental state required for depraved indifference murder is recklessness. *Id.* The issue for the jury in this case was whether Elliott's actions were reckless, "imminently dangerous" and presented a "grave risk of death." *See id.* "Generally, the assessment of the objective circumstances evincing the actor's 'depraved indifference to human life'– *i.e.*, those which elevate the risk to the gravity required for a murder conviction–is a qualitative judgment to be made by the trier of the facts[.]" *Id.* (citations omitted).

With this as the pertinent legal backdrop, the task for this Court is to consider whether *any* rational trier of fact could have found that Elliott's reckless actions were imminently dangerous and presented a grave risk of death. *See id.* Although the bulk of Elliott's legal argument on direct appeal was that the prosecution did not sufficiently establish the "depraved indifference" element, a careful reading of his brief shows that he also was arguing that the prosecution did not prove causation. *See* Petitioner's Brief on Direct Appeal at 12 ("Indeed, the proof failed to establish precisely what took place between Dunnigan and the appellant after the Muellers left on May 11, 1997. There is no indication in the record that appellant engaged in any conduct which caused Dunnigan's death."), Respondent's Appendix of Exhibits. Based on the record, this argument is unavailing. Elliott admitted to two people that he had hurt or killed Dunnigan; he admitted to one of them (Mueller) that he had strangled her to death. He admitted to the other person that Dunnigan "started to turn colors" and that he believed she was dead. "[E]vidence of a defendant's conduct and emotional state after the commission of a crime may be relevant to showing his 'consciousness of guilt.'" *Solomon v. Commissioner of Corr. Servs.*, 786 F. Supp. 218, 224 (E.D.N.Y. 1992) (citing *People v. Benzinger*, 36 N.Y.2d 29, 364 N.Y.S.2d 855 (N.Y. 1974); *People v. Levine*, 65 N.Y.2d 845, 493 N.Y.S.2d 290 (N.Y. 1985)). According the

-14-

prosecution's chief medical witness, the autopsy findings pointed to the conclusion that Dunnigan died of strangulation as a result of manual pressure being applied to her neck; he determined, for instance, that the damage to the hyoid bone was caused by severe pressure to the neck organs and neck muscle. Although the defense presented a medical examiner who opined that Dunnigan died instead from a drug overdose, the jury was entitled to find this witness not credible and to reject his testimony in its entirety. *See Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (A reviewing court may not "'reassess the fact specific credibility judgments by juries or . . . weigh conflicting testimony.'") (quoting *Anderson v. Senkowski*, 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992)). Thus, viewing all of the evidence in the prosecution's favor, a rational jury certainly could have determined that Elliott caused Dunnigan's death.

Furthermore, based on the uncontroverted testimony, this Court cannot say that a rational jury could not have found that Elliott's actions were made with a reckless disregard of a grave risk of death, so as to establish the element of "depraved indifference." The proof at trial was that Elliott and Dunnigan were in a volatile relationship plagued by emotional abuse and alcoholism. On the record before it, a rational jury could have concluded that Elliott placed his hands around Dunnigan's neck and recklessly applied pressure–with no intention of killing her, but rather to vent his anger about the events of earlier that night. *See, e.g.*, *Towndrow v. Kelly*, No. 9:98-CV-0509, 2000 WL 33743385, at *3 (N.D.N.Y. Dec. 20, 2000) (evidence sufficient to support conviction of depraved indifference murder where victim died of "asphyxia due to neck compression;" petitioner confessed to choking the victim, who was seventy-six pounds and was seventy-five years old; while being choked to death, three of the victim's ribs were fractured causing internal hemorrhaging; the internal injuries to the victim's were consistent with a "considerable" amount of force being used by the perpetrator; and the chief medical examiner

-15-

testified that the incident was a homicide). Since a rational trier of fact could have found that the prosecution established all elements of a depraved indifference murder beyond a reasonable doubt, Elliott is not entitled to relief on this basis.

## CONCLUSION

For the reasons stated above, petitioner Robert C. Elliott's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

*/s/ Victor E. Bianchini*

_____
         VICTOR E. BIANCHINI
         United States Magistrate Judge

DATED:        March 28, 2006
              Rochester, New York.